This is case number four fourteen zero zero five six and we have miss Ryan for the appellant and for the appellee Mr. Maggio, is that how you pronounce it? Okay. Thank you. And this is Linda Markham versus the Department of Children and Family Services You may proceed counsel Linda Markham, who I will refer to as Linda, consistent with the briefs. Linda has, for about fifteen years now, been the supervisor of an after school program that's the ministry of a church working out of a public school in Macon, Illinois. And as part of that, it's an after school program and they have about forty children that come to this program By all accounts, during this fourteen, fifteen year period, there has never been a problem with this after school care. DCFS has never been called, police have never been called, there has never been a serious injury, a child who has gotten away, anything of the sort. The parents who testified, one of whom was a police officer, that it just appeared to be a top notch program, appeared to be well supervised. The people, sometimes young people, who were in charge of the children seemed very attentive to the children. Then in January of 2013, on a seasonably warm day, in about sixty degrees, it's starting to get light out earlier in the evening, two kindergarten age boys wandered off. And this is a situation where you have a fence in a public school, partially fenced playground. Kids were out playing and they made their way through and opened the fence and got away. My client, Ms. Markham, was indicated for a form of neglect, failure to supervise. There was a DCFS administrative hearing. The ALJ, in that case, Carol Silcox, who heard all the evidence and considered everything, said no, it should be expunged. That was the recommendation to expunge it. The director disagreed and wrote a letter indicating that no, the expunsion is denied. This was taken up on administrative review in Sanford County and Judge Breaux agreed with the director. And he affirmed. And he said, one of the things he said that I kind of think sums up how perhaps the director and he looked at this case. He said, two five-year-olds wandering down the street while under Linda's care is ample evidence describing the injurious environment harmful to these children. It is bad when five-year-olds get away from a daycare. And I think we can all agree with that. Certainly my client was horrified by the whole process. But it can't end there. It's not a strict liability standard that because something bad happens that automatically someone is indicated for that. And there are regulations and there's a statute that governs this. And the statute involved, it's called the Abuse and Neglected Child Reporting Act. And it describes, it has two, it has a kind of wide description of what a neglected child is. And part of that description, it states that, is there an environment that creates a likelihood of harm coupled with, is that likelihood of harm the result of blatant disregard of caretaker responsibility? I believe that there is truly no evidence in this case indicating that there was a blatant disregard of caretaker responsibility. And I think that that factor in the law is, was basically not regarded by the director and it was not given regard by Judge Brough. So I think your job here is to review what the department did rather than what Judge Brough did. But I believe that there is no evidence of a blatant disregard of caretaker responsibility. DCFS argues, look at other language in what's described as a situation where a child is neglected. And if you look at the Abuse and Neglected Child Reporting Act, there is a description. And it's kind of sandwiched in the middle of the description of what a neglected child is. And this is in between categories that talk about not being nourished, not getting shelter. It's sandwiched with general language that says, or other care necessary for kids or for well-being. It goes on to say, including adequate food, clothing, and shelter. But then it hits the language. And I think that the reasonable analysis of this language is that really the only language that can apply to this case is the language that states the child's environment creates a likelihood of harm to the child's welfare and the likelihood of harm to the child as a result of blatant disregard. Now, what is the definition of blatant disregard has to do with, it states that an imminent risk of harm would be so obvious to a reasonable parent or caretaker that it's unlikely that the caretaker would have exposed the child to this danger. When one looks at the facts of this case and the background of my client in terms of what that could possibly be, it's very difficult to reach any kind of a conclusion of any kind of blatant disregard. And the facts were as follows. Successful 14 years of running this program. We have young people who worked for her. The day at issue, the two people on the playground were a 20-year-old and a 22-year-old, both of whom had like four years of experience working for this after-school program. Never had any history of being problematic, of not paying attention to kids, of allowing other children to get away, anything of the sort. They were good workers by all testimony. There was no DCFS policy violated. And when the caseworker in this case testified at the administrative hearing, she admitted that. When asked what policy was there that was violated, she couldn't cite any policy that was violated. Were these children truly left alone? No, they weren't left alone. So going through, asking her the questions found in the regulatory scheme here in terms of what can you point to indicating that she's being guilty of neglect, her answer time and time again was these kids got away. And, you know, they were five-year-old kids who decided they wanted to play, I think it was ninja, karate, and they apparently made an attempt to get away earlier in the day because there was one of the workers, a 17-year-old, who had been in the back of the building who said, no, they tried to get away earlier and I stopped them. Unfortunately, that worker never told my client that, so that she could jump in and do something about it. She was in and out of the facility that day, as she always is, because you have the playground area and the inside area, so she was in and out constantly when this incident occurred. The ALJ, she basically summed it up saying it was an accident. And really that's what it was. It was an accident. After 14 years, an accident occurred and these two kids got away. The time frame at issue was about eight minutes. It was still light. The mother of one of the children said that it was still light outside when it occurred. They were brought back. The boys at the time of the administrative hearing were still students there. The parents testified that they still trusted Linda and trusted the facility was still doing a good job. So when you look at the term likelihood, that she should have seen that there could have been a likelihood that harm would come, certainly these parents didn't see it. And certainly even after the incident, they didn't expect that there would be any kind of likelihood because they kept their children enrolled in the program. Other parents testified, one of them had children who had attention deficit issues and so on and so forth, and she said these supervisors of these kids do a great job. And she lauded how they did. A detective, a juvenile detective who testified said, I'm well aware of the program. I've been well aware of the program for years. It does a great job. I bring my own kids to the playground and see how well supervised it is. By conceding that this was what is called a mistake or an accident, by conceding that this was an accident, is it essentially a position that the department is taking the view that it is imposing absolute liability upon anything that goes awry? I do. I think in this particular case that something bad happened and that somebody was going to get indicated, and I do believe that that's the position they take. And there are some cases, and I think it was the walk case. So something bad happened, but an indicated finding wasn't justified. I believe it was not justified. And I believe that it was not justified based on analysis of the statute that governs and then based on the regulations that come from that statute. And I believe that a mistake was made. And I think that you can do a de novo review of whether the statute was applied in this case. And I believe that the statutory language was not applied in this case. And that if the statutory language was applied, that there would not have been an indication by the director. Because that's where you have this higher standard that I've just discussed. Now if one looks at the regulations that are in play, and there's a number of regulatory pieces of language that talk about what inadequate supervision is. And what the director did is he took certain elements from what is inadequate supervision and he relied on those things. I think it's important to keep in mind that the director was not the trier of fact here. That was the ALJ that was the trier of fact. But we are required to impose the legal fiction that the director is the person making this decision whose decisions are entitled to deferential review. And that is absolutely correct that that is the way the rule works. I do believe though, and the case law says this, that the review in court is not to be blind deference to the agency's decision. And when you look at an analysis of the facts, the standard is was there a clear mistake? I believe there was absolutely a clear mistake in this case. And that if one looks at all of the facts of this case, that it really is almost impossible to conclude that applying the standards that are in place, that this is a case where Ms. Murtham should have been indicated for neglect essentially. If all of the factors are analyzed. The cases that were cited, that I've cited, one of them is a fourth district case and it's the Walsh case versus DCFS. And counsel has stated in his brief that he's right, that the facts are different. Well, these are the kind of situations in cases where the facts just are going to be different because that's the type of situations we have. But that was a case where we have foster parents, we have some kids with serious, serious behavioral issues. They get killed by numerous farm animals and kind of out of control children, vandalize things and so forth. And the parents constructed a confinement, which the children spent very little time in there. But the agency basically determines, hey, you confine these kids so we're indicating them. And this court, the appellate court said, no, you have to look further than that. You have to look how is the confinement used, for what duration was it used, those sorts of things. And I suggest to this court that a similar type of analysis needs to be done in this case. Yes, there was something bad that occurred, but what are the factors that go behind that? This case really cautions about per se determinations. This happened, that happened, therefore there's an indication. And I believe that in this particular case, that is what occurred. That basically it was a strict liability standard, which the regulations in the statute do not provide for. That indicated that Mrs. Markham received an indicated fine. There's another case called Slater v. PCFS. And that had to do with a young teenage mom who had a seven-month-old who was kind of cruising about. She was doing her homework, colored pencils laying about, and this baby tripped or fell into a pencil, got stuck in her neck, and she ended up with a punctured lung. Mom gets indicated for neglect. Similar kind of analysis, really. The court looks at this and says, was mom generally attentive? Determine, mom was generally attentive. In this case, was Linda Markham generally attentive? She wasn't only generally attentive, but all the evidence. She was very attentive and a very good administrator of this after-school program. Was this mom, young mom, was she a concerned parent? And the evidence was yes, she was a very concerned parent. Similarly here, was she a concerned administrator of this after-school program? Absolutely, and the evidence was very decisive that she was. Was the baby in that case receiving care necessary for the baby as well as the baby? Absolutely. In this case, were these children receiving care? The record is complete with how kids had to be escorted outside, that the kids aren't going outside until their homework is completed. They got a snack program. You know, all sorts of parental testimony regarding what a good job she does in that regard. There's another case, Lyons v. DCFS. And these are all fairly recent cases. Lyons is 2006, Slater was 2011. And in this case, a teacher's assistant was indicated for abuse because there was an unruly child attempting to restrain the child, the child's hand gets bumped. He's indicated for abuse. Same kind of analysis. Just because there's an injury doesn't mean that there was abuse. And in that particular case, as in all of these cases, the finding of the agency, sometimes it was overruled by the circuit court, then the court reversed both the circuit court and the agency in these cases. So there is certainly precedent for this court looking at the situation of this case and applying the facts of this case and looking at the law of this case and saying that a strict liability standard is not appropriate and that this is a case where it was not appropriate to indicate her as the hearing examiner who heard all of the evidence concluded in this case. The workers who I had talked about, they were college students, some of them. These weren't kids who had just been around there because they were around. There was testimony of all of the warnings that Ms. Markham constantly gave them. You're not here to gossip. You are here to take care of these kids. There was evidence of how they kind of fanned out over this playground that they had walkie-talkies, that they communicated with each other. What's the consequence of this syndicated finding? Well, originally, our client was informed that she shouldn't be teaching there. And for a period of time, she stopped, and other people ran the organization. When I found that out, I looked into that, and I did not find anything that would prevent her from continuing on as the director and suggested to her that she should go back to what she was doing. What it is from a personal level is somebody who has invested her wife's work the last four years. Well, I understand this better. It's something which is unpleasant at a minimum, but my question was more directed towards how it affects her employment. I have not found a research that has not found anything that says she cannot, because of the day-to-day finding, continue to work there, and she is working there to this day. Are there liability concerns and so forth? I have some, but she is continuing to work there. So I think the light is on. Thank you. Thank you. Thank you. Good afternoon, Your Honors. And may it please the Court, my name is Timothy Modger. I'm the assistant attorney general this afternoon, and I represent the Department of Children and Family Services and its director. Your Honors, the director's finding in this case, his conclusion that there was inadequate supervision of children, was not clearly derived. It wasn't clearly produced, and it can't be clearly derived. Where we have at least these two facts. We have two five-year-old children that wander off from a care center. The staff of the care center does not notice the children wander off. But perhaps more importantly, the staff and director of the care center have no idea whatsoever that the children are even missing. Let's remember this. This is not just simply that the children wandered off. The children wandered off, and the director and the staff have no idea whatsoever that the children were missing. Before I get into the facts, I would wonder, with the Court's permission, might I start with the law in this case, and just make sure that we can see. Yes. Ms. Markham was indicated under Allegation 74 for inadequate supervision of children. We've talked about that. The statutory basis for Allegation 74, as this Court acknowledged in law, as Justice Burkett talks about in his concurring opinion in In Re Julie Q, there are a lot of sources that talk about the source of, opinions rather, talk about the source of Allegation 74. It's found in that portion of Section 3, which defines a neglected child, pardon me for reading, as any child who is not receiving care necessary for his or her well-being. That's the source of it. Allegation 74 and the statutory authority have been around, I think, for decades. Full stop. In contrast, the body of law that we hear about today, about injurious environment, that body of law came into the statute only on July 13, 2012. So the body of law about injurious environment, latent disregard, has nothing, nothing to do with Allegation 74, and nothing to do with this case. Allegation 60 is in the Department of Regulations. It deals with injurious environment. The Court might be aware of that. Allegation 60 is an allegation that talks about our children are exposed to the toxic vapors because there are illegal drugs being manufactured in the house, etc. But just so we're clear, Allegation 60, injurious environment, the law supporting that has nothing to do with the case we hear today. Well, Counsel, in Allegation 74, we have child factors, caregiver factors, and incident factors. Why don't you walk us through it and tell us how those apply in this case with these facts? I'd be happy to, Your Honor. The Director found, okay? The Director found the proportion of Allegation 74 they focused on was that these children were, and I quote, likely to require, they're put in a situation where they were likely to require judgment or actions greater than the child's level of maturity would reasonably dictate. So were they put in that position by being out on the playground, being supervised, or were they in that position once they escaped? They were put in that position once they, and I prefer not to use the word escaped. Well, sure, once they left without permission. We'll put it that way. They were put in that position because the situation was such that they were allowed to leave. Exactly right. And then to continue wandering the streets of town without anyone knowing that they were gone. Now, you say allowed to leave. Were they allowed to leave? I mean, were they able to leave? Yes. Were they allowed to leave? I'm not so sure. Your Honor, may I address that directly? Yes. Because I think that's an important point. These two children, right? There are three aspects of what we're talking about tonight. These two children, first, gave every indication to Ms. Markham's staff that they had every intention of leaving. In fact, they tried it once and were walking out the gate. And one of the staff members noticed that the children were leaving, but that staff member did not communicate that intention to either Ms. Markham or any other staff member. We heard slightly to the contrary earlier this afternoon, and there's no record support for that at all. That member did not communicate it to Ms. Markham or any other staff member. So at that point, whatever system they had was working. They were caught on their first attempt to leave. Your Honor, if I might just push back on that. I don't think so, right? They happened to have been caught, but that's the problem here. It's happenstance. There is no system. That's what we're going to get to. There is no system. They happened to be caught then, but they didn't happen to be caught the later time. And here's the thing about there is no system, right? The children were out then on the playground, and they walked 40 yards. The testimony is that this playground is half a football field, and that between the back door and where they left up on the concrete was 40 yards. These children walked 40 yards in plain sight, and no one saw them leave, except one of the other little children who saw them leave, right? So they walked on plain sight, and nobody stopped them. And here's the third thing, Your Honor. The children then were allowed to wander around. Whatever right word you want to use. The children wandered up and down the streets of town. They were off on their own. And no one, Ms. Markham nor her staff, it's not that they didn't know where they were. Now, the Ms. Markham nor any member of her staff even knew that they were missing. And if the children were missing eight minutes or if they were missing longer, and I'm happy to talk about that if Your Honor is clear about that, but if the children were missing eight minutes or eight or longer, it would have been one hour and eight minutes if the first child's mom didn't show up for an hour later. Well, isn't that speculation? I'm sorry? It's not speculation, Your Honor, because in all of this, while they're out looking for the first child, because the first child's mother happened to come, they didn't realize the second child was missing. They had no way of knowing that there was a second child missing. They had simply no system in place. And when you have people out on the playground that don't notice people walking down a plain view 40 yards and leaving, when you have people who are searching for one child and have no system in place, do you even know that there's a second child leaving or missing? In fact, when they went looking for the first child, the testimony is they saw two children walking down, and they thought, oh my goodness, that can't be. We're only missing but one child. And it wasn't when they came up upon them that they realized, in fact, no, they're missing two. So when you put that together, you're talking about a staff that was, come up with the phrase that everybody's most happy with, not sufficiently experienced, not sufficiently matured, not sufficiently trained, but these people were not able to take care of these children. And we sit here and we say, well, you know, the question is, well, what is it that puts this at the feet of Ms. Marvin? She said, well, it's not, you know, it's not my responsibility. But at the end of the day, Ms. Marvin, there's no dispute that Ms. Marvin was in charge of this program. There's no dispute that Ms. Marvin selected these monitors. There's no dispute that Ms. Marvin supervised these monitors. And there's no dispute that Ms. Marvin was the one that came up with the rules that these monitors were supposed to implement when they were out on the playground. So when you put that together, you are, I think, the director, certainly, by the way, I'm clearly a voting center, I think the director, there is more than sufficient information, evidence in the record, to support the director's determination that there was inadequate supervision of children here. If I might circle back and talk about one more point of law, Your Honor, just so we make sure we're on the right page on that. There's been some talk about, well, you know, there's no, the director didn't identify some other DCFS rule or regulation out there. But there's no requirement that the director find some sort of written regulation about the number of students that have to be out on the playground, or the number of, or where people stand on the playground. The director applies the factors in Allegation 74. There's no state of mind requirement here like intent. This is not a negligence tort case. The question is simply whether the director, applying the factors in Allegation 74, comes to a reasonable conclusion that there was inadequate supervision of children on this day. Counsel, I asked a question of Ms. Ryan, and I used the term illegal fiction, and I did so advisedly. I'm reminded about that view of the argument just made about the findings made by the director. I'm also reminded of the wonderful line by William Gilbert, the lyricist of Gilbert and Sullivan fame, who was a lawyer himself, and who wrote, legal fictions are important things, and sometimes we have to salute them, paraphrasing it now. The reason I mention that is we have the legal fiction in this case of the experienced ALJ, who actually saw and heard the witnesses in this case, and came up with a written judgment and report. And then we have the director, who did none of that, reviews the report of the ALJ, and apparently not disregards it, but disagrees with it, and comes up with his own factual findings and conclusions, etc. That legal fiction is, we're supposed to be deferential to as if it were the trier of fact, which this court certainly is when trial judges make their rulings. Nonetheless, it's a bit troubling, counsel, that the ALJ, selected by the department for this important task, has made these determinations and they're disregarded by the director, and I suppose what I'm doing is asking to what extent, if any, these findings by the ALJ, and what she concluded and recommended, should serve to inform the judgment of this court as it evaluates this overall record. I think, at least with respect to the last part of the recommendation, it's not at all. Let me be clear on this. We have to observe the legal fiction that it's the director whose decision we have to give deference to. It's not just legal fiction, I guess, unless legal fiction is also embodied in regulation. What we have here is the ALJ has gone through and made findings of fact. By the way, the director adopted the findings of fact of the ALJ, so I don't know, when we're talking about the director veering from the factual findings, I don't know. The director said, and I quote, that he believed the ALJ did not adequately consider and weigh the factors. So, the facts of what they are, the consideration of it is what the director can tell you. Second, right, it's the statute, 89-366-220. It's a brief that expressly gives the director, after he receives the ALJ's recommendation, he may accept, reject, amend, or return the recommendation. So he has the latitude. Third, and there's some discussion about whether... Can you explain why the ALJ's decision was inadequate or wrong regarding her assessment of what should be done based upon the facts as she found them? I'm sorry, can you explain that? Yes. In his letter, he did not explain what was wrong with it. He simply said that he believed that she misapplied, misweighted, as I said, misweighted the factors. But provided us no analysis of his own as to how the factors should be corrected with. Well, he did. He went on and explained what he thought the factors should be and how they should be weighed. Well, that was my question as to... Did he explain where she went wrong? I misunderstood. I thought, you know, in sort of Chapman versus saying she went left and here's how I'm going right, he just said where he was going. It's in the record of page 17. And he talks about how one of the factors of whether the children were being left in inadequate or inappropriate caregivers. He goes on to talk about the maturity of the caregivers, their ability to see the children, the duration, time of day, et cetera. So he sets forth the factors that he finds most important in his analysis. If that's responsive to Your Honor's question. Okay. There's also a little something in the briefs about whether the transcript had been prepared at the time of the director. I don't know if the court is interested in that or not. If you are, I'll address it. If not... You can address that. Okay. But before you do that, I mentioned before the factors and you were just talking about those with Justice Steigman. The caregiver factors, it seems that the director applied those as if the children had been dropped off on the street unsupervised. Your Honor, respectfully, I don't see that in what the director said. I don't see that... Well, the first factor, the presence or accessibility of the caregiver, apparently, you know, when the children were on the playground, there were caregivers accessible to them and, you know, within their presence, correct? Yes. Okay. And then the next factor, how long it takes the caregiver to reach the child. Are we looking at once they had left or are we looking at when they're on the playground? Well, I think we fall into a bad trap when we simply think we need to find the presence of all of those factors. I don't know that there's any indication of that. What we're talking about, though, is when they're on the playground and there are caregivers out there and the testimony differs. One person said, oh, I think they were standing apart. Another person said, no, they were over in the corner having a chit-chat together, right? When they're on the playground and the simple truth of the matter is, as I said before, you walk 40 yards in plain sight and no one stops you. But I'm talking about how long it takes the caregiver to reach the child on the playground and you do that. That's the factor I'm talking about. Oh, well, on the playground, probably wouldn't take the caregiver very long. When they're out on the street, it took them an infinite amount of time because they didn't even know they were missing. And then the next factor, whether or not the caregiver can see and hear the child, obviously they could out on the playground, correct? They could not because these children walked 40 yards in plain sight and walked out and no one saw them. Other than another child. Other than another child, correct. Okay. That's what I'm getting at. The application of the facts to the factors seems distorted, in my opinion, when it comes to the director's decision. I just don't quite understand how they were applied to the factors. Well, I mean, I suppose the best way to respond to that is, again, in the first instance, this is the director's decision to make this determination, right? And our task here is to determine whether or not that's clearly erroneous. It's a definite firm conviction that some odd mistake was made. And the director sat back and said, look, we have no policy whatsoever. Right? We have no policy. Let me go back to the director's statement. The director goes back and says that the caregivers are inadequate in this particular case. And the director takes a look at the facts of the case and says, two tiny children, 40 yards, what we've talked about before. We now take a look at the breadth of the case, and there's no policy about communicating important information. There's no policy about where to stand when you're out on the playground. There's no policy about what to do, how to even make sure whether a child's gone home or whether a child is missing. Remember, there's all this testimony about how we have a sign-in sheet. When a kid arrives first time of day, sign in. When the parent shows up in the evening, the parent doesn't even need to speak with anybody from the center. The parent can sign out the child. Well, what happens if the child doesn't sign out but is just plain missing? There's no system in place for that at all. And I think when you have those three lapses, it seems to me that there is credible evidence that a reasonable person could conclude that a child has been neglected. It seems to me that the director's determination in that regard is not a piece of discussion, or is not clearly wrong in this regard. If you don't mind, do you want me to talk about the transcript? Yes. There's a mention here that the transcript was not prepared until after the director had made the decision. As we talked about before, the director adopted the findings of fact made by the ALJ, and those findings of fact were set out in some detail. The director had the decision, had the right to reject. But also, if counsel is intending to make some argument that the director, if they were trying to make an argument that the director reassessed the facts, which he did not, that they would have to make the argument that he did not go back and review the hearing at all. And the hearing, as the record plainly shows, was an audio recorded hearing. I don't know what happened. The director adopted the findings of fact. So we're talking about fiction world here right now. But there's nothing in the record. It was their burden, I should say, if you don't mind, it was their burden to make any record that the director had no possibility of listening to the facts in this case. And there is simply no record here. One last point, if I may, I see my time is running short. We heard a fair amount today about history of 14 years and 15 years. And I'm certainly not going to stand here and impugn that and say there's anything wrong with that. That's a wonderful fact. But the history of Ms. Markham has nothing to do with the finding of Allegation 74, inadequate supervision of children. The history factor comes from the Lyons case, which is not from this court. I don't remember the district it's from. And in the Lyons case, it was an abuse action. And one of the components, one of the factors of the abuse allegation was whether the appellant in that case had a history of abuse or neglect indication. Let me find it. In 368.3 and 561, one of the factors of the allegation is whether the appellant has, quote, a previous history of indicated abuse or neglect. So we can talk about 14 years or 15 years of abuse or neglect and whether there's been a finding, and that's a component of an abuse indication or an abuse allegation. But here, the question simply is, on this afternoon, did Ms. Markham and her staff, did they inadequately supervise the children? And when you have clear indications, evidence of no relevant policies, and when you have clear evidence that multiple mistakes were made, nobody communicated, nobody saw them leave, nobody even knew they were missing. I keep coming back to that, but that's not an inconsequential point. Your time is up, counsel. Thank you. The best I can determine from counsel's argument is that the definition of neglected child under the Act is something that simply doesn't apply to this case. The fact that in 2012, the Act was amended to add the arm stating that the likely harm is the result of a blatant disregard of parent or caretaker responsibilities, that that doesn't apply. Well, statutes mean something. And when a statute is written a certain way, it can't be disregarded. And certainly, there is nothing in the law that would say, okay, you can look at a statute and that it should be interpreted in favor of the agency as opposed to the person to whom it's supposed to apply. And with respect to that standard, the result of blatant disregard of parent or caretaker responsibilities, how does one look at that language and not look at the history? That's like looking at this young mother and saying, hey, she's been a very good young mother, yet the bad thing happened with the colored pencil to this baby. That's like saying, okay, we're not going to look at the history of this little girl or this young lady and say, okay, she's been a good mom so far. We're just going to go right to the day that this baby fell on the pencil and it stabbed the baby in the neck. Nonsense. I believe if you look at all of this language here, you have to look at what led up to this. And this whole concept that there are no policies, it's very interesting that with respect to TCFS policies, counsel indicates, well, it doesn't matter if TCFS has a policy or not. Well, in fact, with respect to the policies of this organization, they've worked for 14 years. And I'm thinking of Jake. There's a young man named Jake who testified and talked about how we scatter across the field. We have walkie-talkies. We make sure we know when kids are coming in and out and so on and so forth. It works for 14 years. And the suggestion that somehow these kids are allowed to just wander, that it's almost as if they were invited into a birthday party in her office or something and you kids go fend for yourself, there's absolutely no evidence of that. This is a situation where a bad thing happened that day, these kids got away, but that what she had in place was very solid and very good in terms of how these children were cared for. And quite frankly, there's no evidence to the contrary. And with respect to the language he's talking about, with respect to other care necessary for his well-being that counsel mentioned, that's sandwiched right in the middle of the statute of language having to do with health care and nutrition and things of that sort. And then it goes on to talk about the injurious environment, which I believe is the language that applies to this case. Getting back to the regulations of inadequate supervision, and you asked counsel to somewhat go through those, there are some things that the director turned to, and by the way, some of it goes to credibility. Was it laid out or not? And that gets into credibility issues. And with respect to was the transcript prepared, that was a stipulation, the state stipulated that there wasn't a transcript prepared. And by the way, they have the obligation to present a transcript, and the transcript that they presented had many pages missing, so we had to get another transcript done so that there was a full transcript. So the suggestion that the director had everything to look at, much like the ALJ did, I find very hard to embrace. In terms of inadequate supervision, he picked a few and went through those, but there are many other factors for inadequate supervision. Some of it had to do with the condition of the child. Now these were little kids, but were these kids with disabilities? These were bright kids. They knew what they wanted to do, and they figured out a way to do it. Wandering the streets, well, yes, they got away, but this isn't a situation where we have any history of allowing kids to go wander the streets, and certainly not, that was not what this Linda Morgan outfit was all about. It also gets into things about the caregivers. Are they under the influence of drugs or alcohol, or do they have any problems? And all of the evidence in this case is the answer is no, that these were good, responsible kids, and that this incident happened. And we're talking about a 20- and 22-year-old. We're not talking about teenage children. So thank you very much for your time. The request that Linda was making is that this court reverse the decision of the young child and of the director. Thank you very much. Thank you, counsel. We'll take the matter under advisement.